HULL, -T.,
dissenting.
I have been unable to agree with my colleagues in all of the conclusions at which they have arrived, and, in view of the importance of tbe questions involved in these cases, it has seemed to me to be my duty to state my views, orally and briefly, upon the questiona concerning which 1 differ from the majority of the court.
it is my judgment that the same decree should have been rendered in this court that was entered in the court of common pleas, enjoining the sale of this property and plant, both outside and inside the city, for the reason that the sale of the part of the plant outside of the city is invalid on account of irregularities in the proceedings of the council; and for the further reason that taking into consideration all of me irregularities in those proceedings, considering the price at which the property was sold and tbe manner in which it was Bold, the sale itself was an abuse of corporate power, within the purview of section 1777, Revised Statutes.
The application for an injunction in these cases is made by tbe city solicitor on behalf of the city, or on behalf of the taxpayers of the city.
The judge of the court of common pleas found that the preliminary resolution which was introduced in the council looking toward this Bale and directing the advertising of this property, was a resolution of a permanent and general nature, and that a resolution was the proper method of bringing this matter before the council, and that, therefore, it was necessary to proceed according to section 1694. Revised Statutes, and to have had that resolution read before the council on three separate days, or to have such reading suspended by a three-fourths vote of the council. And this is also my judgment, if the council could proceed by resolution alone.
*627 It is urged, however, that it was not necessary for the council to proceed in as formal a manner as by resolution. It is conceded that this sale, or attempted sale, is to be governed by the provisions of section 2673a, Revised Statutes. The council attempted to proceed under that section. A portion of the property at least being real estate, and a very large part of it appurtenances to real estate, and all heing sold together, it is clear that the provisions of this section must control; and the section provides that before a sale is made certain things must be done by the council. It provides:
“That the council of any city or village, which has not a board of improvements, or board of public works, shall have' power, three fifths of all the members elected thereto voting therefor, to offer for sale or lease any real estate and appurtenances belonging to such city or village, and place the proceeds arising therefrom to the credit of such fund or funds as to said council may seem proper; provided that invitation for written bids for such sale or lease shall be first published for two weeks in some newspaper of general circulation,” etc.
The council may offer for sale any real estate belonging to the municipality if they comply with the provisions of that section,’ and that section was passed after section 1692-34; and the purpose of it seems to be to provide in some manner'for the sale of real estate and to lay down the steps that the council must follow in order to sell real estate. It provides that three-fifths of the members of the council elected thereto must vote therefor, so that some action of the council was necessary to bring the matter before it.
Section 1692-33, Revised' Statutes, provides for the exercise of the power of sale. Section 2673a does not provide how this matter shall be brought before the council,and it has been said the council may act by ordinance, resolution or order, as provided in section 1655. They passed a piece of legislation, however, which was called a “resolution.” They did not proceed by order, and in my judgment tbe word “order” in this section does not relate to such a proceeding as this, but is akin, in some respects, to the word “warrant;” and in that I am supported by Dillon on Municipal Corporations. They undertook to pass a resolution in order to bring this before the city council. It was evidently the judgment of the city council— the legislative bodj — that this was necessary. It was, apparently, the judgment of counsel who, according to the testimony, either prepared or superintended all of the proceedings in regard to this matter, that a resolution was necessary. And that is the way they proceeded. It has been suggested that they might have proceeded by motion. But they did not so proceed, and I do net think it was the intention of the legislature that a. matter of such importance as this should be brought before the council for its consideration in as informal a manner . as a motion. It was not the purpose of the legislature in enacting this statute to provide that all that should be necessary to start proceedings to sell city property would be for a member of the city council to move that they sell the city hall, or. sell the gas-plant cr any other piece of public property, and that the clerk be directed to advertise for bids. A resolution . is as informal a way at least as was intended by the legislature that the council should proceed, under this statute. In any. *628 event, they proceeded by resolution in this case, and it seems to me that when their action comes before a court, the judgment of the legislative body as to the particular manner in which they should proceed — there being no express provision in the statute — is entitled to some weight.
If tne resolution is of a permanent and general character, it must have been passed according to section 1694; have been read three times on separate days, unless suspended by a three-fourths vote of the council. Now this provision of section 1694 is a provision of great importance. It is not one that should be diminished or weakened by judicial construction. The powers that the council and municipal bodies have are such powers as have been conferred upon them by the legislature, and no others, and those powers, as the supreme court of this state has said many times, are to be strictly construed against the corporation, and whenever there is any doubt, as the court have said, and many other courts of last resort, that doubt is to be construed in favor of the taxpayers and against the council who are attempting to act. This provision of sec-ton 1694, Revised Statutes, is intended to restrict the council in the performance of such acts as are of a general or permanent character, intended to require deliberation, and intended to require them to have such a resolution read at three separate and different meetings, to give the council an opportunity for discussing it and thinking about it, and to ascertain, if they see fit, the views of the people, who are their immediate superiors and principals, in regard to the action which they propose.
It seems to me that there can be no question but that this resolution was one of a permanent and general nature. It was a resolution that set on foot proceedings for the sale of property that cost the people of this community a million and a quarter of dollars. It was a resolution to begin proceedings that looked toward the taking from the publio the title to this property and forever vesting it in private owners. It was a resolution in which not only every taxpayer, but every inhabitant of this municipality was interested. The supreme court said, in State v. Toledo, 48 Ohio St., 112, where the validity of the Toledo natural gas works statute came m question, on page 140 of the opinion:
“The natural gas works for which Toledo has issued its bonds, are owned and controlled by the municipality, and not by individuals. But every citizen, as a member of the community, has an interest in their construction, management and maintenance The advantage resulting from them is tendered on equal terms to every inhabitant of the city. And the terms and conditions on which the'benefits are to be enjoyed by the whole people are dependent largely upon the action of the people themselves. In our judgment, the taxation authorized by the general assembly for the payment of the bonds issued, was in no wise to subserve a private purpose, when used as language of constitutional limitation. The establishment of natural gas works by municipal corporations, with the imposition of taxes to pay the cost thereof, may be a new object of municipal policy. But, in deciding whether in a given case, the object foe which taxes are assessed is a public or private purpose, we cannot leave out of view the progress of society, the change of manners and customs, and the development and *629 growth of new wants, natural and artificial, which may from time to time call for a new exercise of legislative power. And, in deciding whether such taxes shall be levied for the new purposes that have arisen, we should not, we think, be bound by an inexorable rule that would embrace only those objects for which taxes have been customarily and by long course o: legislation levied.”
And on page 137 preceding this, the supreme court said,at the inception of this enterprise:
‘‘Heat being an agent or principle indispensable to the health, comfort and convenience of every inhabitant of our cities, we do not see why, through the medium of natural gas, it may not be as much a public service to furnish it to the citizen, as to furnish water.”
So that the supreme court held that not only every taxpayer, but every individual of the municipality bad an interest in the natural gas works, and seemingly set its approval so far as it could upon the plan which was then conceived to be for the advantage of the whole people.
It is not necessary for me to read from Campbell v. Cincinnati and Elyria Gas and Water Co. v. Elyria, supra, which have been cited by my colleagues and which hold that any resolution of a permanent or general character must be read three times, on three separate days, unless the rule is suspended, and in default thereof that the action of the council is absolutely null and void. This court at its last term in this county, held that a resolution looking toward the ordering of the construction of a four-foot sidewalk in front of a fifty-foot lot was a resolution of a permanent character and must be passed according to section 1694. A resolution which resulted in the sale of property which had cost a million and a quarter dollars and in which every individual in the city was interested, is certainly a resolution of as permanent a character asa sidewalk resolution. The opinion of the judge of the common pleas court in these cases upon this question is full and complete, and its seems to me that the argument which he makes supporting the proposition that a preliminary resolution was necessary and should have been passed according to section 1694, is unanswerable.
It is urged further, by the city solicitors and other counsel for the taxpayers, that before any steps were taken looking toward this sale or the beginning of the sale, an ordinance should have been passed,providing for the exercise of the power of sale of municipal property, and I am inclined to that view. No such ordinance Was ever passed by the common council of the city of Toledo. Section 1692-34 provides for the exercise of the power of sale of public property by municipal corporations. It reads:
‘‘In addition to the power specifically granted in this title, and subject to the exceptions and limitations in other parts of it, cities and villages shall have the general powers enumerated in this section, and the council may provide by ordinance for the exercise and enforcement of.the same.”
And subdivsion 34 reads:
‘‘To acquire by purchase or otherwise,and to hold real estate, or any interest therein, and other property, for the use of the corporation,and to sell and lease the same.”
*630 In my judgment, under that section, before any steps can legally be taken by the council to sell the property of the municipality, the council must provide by ordinance for the exercise of that power. This is the language of the section, if we are to construe the word “may” as “m.ust” or “shall,” and it should be so construed. In the 14 Am. & Eng. Ency. Law, 979, the general rule is laid down thus:
“The word ‘may’ in a statute is sometimes used in a mandatory and sometimes in a directory and permissive sense. It has always been construed as ‘must’ or 'shall’ whenever it can be seen that the legislative intent was to impose a duty and not merely a privilege or discretionary power, and where the public is interested and the public or third parties have any claim-de jure to have the power exercised.”
And in 50 U. S. (9 How.), a decision of the supreme court of the United States, I read a few words from page 259, where the court quote from the language of an English case:
“Where a statute directs the doing óf a thing for the sake of justice or the public good, the word ‘may’ is the same as the word ‘shall’; thus, 23 Hen., 6, says the sheriff may take bail; this is construed he shall, for he is compellable to do so.”
“Without going into mofe details, these cases fully sustain the doctrine, that what a public corporation or officer is empowered to do for others, and it is beneficial to them to have done,the law holds he ought to do. The power is conferred for their benefit, not his; and the intent of the legislature, which is the test in these cases, seems under such circumstances to have bsen ‘to impose a positive and absolute duty.’ ”
The question is discussed quite fully in Mechem on Public Officers,section 593. The last paragraph of the section, quoting from Chief Justice Nelson, of New York, is as follows:
“The inference deducible from the various cases on this subject seems to be that where a public body or offioer has been clothed by statute with power to do an act which concerns the public interest or the rights of third persons, the execution of the power may be insisted on as a duty though the phraseology of the statute be permissive merely, and not peremptory.”
This statute, therefore, should be read that' municipalities shall have the power to acquire and dispose of real estate and they must provide by ordinance for the exercise of the same. Now, when must they provide by ordinance for the exorcise of this power? After the sale is made? After the advertisements have been published? After bids have been made? After proposals have been accepted? After everything is done but the transfer of the purchase money into the city treasury and the order to the mayor to make a deed? The time to provide for the exercise of this power is before the municipality begins to exercise the power.
Section 2673a provides that before this property can be sold they must advertise it. That they undertook to do. It seems that after the advertising of the property for sale, and the offering of it for sale to the Kerlin Brothers Company and others, under this section, it might have been sold either at public auction, or upon written bids as was done in this case, and the offering of it for sale was as much a part of the sale as the acceptance of the proposal of Kerlin Brothers. The offer to sell and the advertising for bids are necessary parts of the *631 sale under this section. After the property had been offered for sale and the bids had been received and opened, a resolution accepting the Kerlin bid was passed, and it is urged that that is an “ordinance” providing for the exercise of the power of sale,and that therefore this statute has been complied with. This has been read. It reads, including the title, as follows:
“Resolution accepting the bid of the Kerlin Brothers Com pany for gas plant lying outside of city of Toledo.
“Resolved by the Common Council of the City of Toledo, Ohio, that the proposal of the Kerlin Brothers Company, for the purchase of all that part of the property (as advertised) owned, used or connected with the City Natural Gas Plant lying outside the city of Toledo,” etc. (And then it describes it) “at the price of $102,000, be and the same is hereby accepted and upon the payment of the purchase money, the mayor and city clerk are hereby authorized and directed to execute and deliver to the said the Kerlin Bros. Company, proper deeds and conveyances of all of said property.”
I am unable to reach the conclusion that that is an ordinance. Evidently the council did not regard it as an ordinance when they were passing it, because they denominated it a “Resolution,” and whoever drew it did not regard it as an ordinance. It does not contain the formal parts of an ordinance, nor is it within any of the definitions of an ordinance. An ordinance is a law of some kind. It is so defined by Dillon. It is a by-law of the corporation for the government of the people or for the government of the council. It has been defined by our supreme court, as has been read,, as a piece of legislation that lays down a permanent rule of conduct, as distinguished from a resolution, which is only temporary in its character. I am unable to see anything in this resolution which simply aocepted the bid which had been made by the Kerlin Brothers Company and directed that the property should be turned over to them, anything that savors of an ordinance or of a permanent rule of conduct. The publishing of it did not change its character and make it an ordinance. It is exactly what it appears to be upon its face — a resolution of acceptance of this bid, and cannot be construed to be an ordinance providing for the exercise of the important power of sale of property belonging to the municipality. It rather falls within section 1693, following 1692, which provides that: “No contract, agreement or obligation shall be entered into except by an ordinance or resolution of the council.” The sale had been made, so far as it could be made, and everything done except the acceptance of the bid, which consummated the sale, and the receipt of the money, the making of the deed and the turning over of the property.
Upon this question of what constitutes an ordinance, I eite Dillon on Municipal Corporations, section 307; Blanchard v. Bissell, 11 Ohio St., 96-103; 32 Kan., 456, 467, 463. The Supreme Court of Kansas there held that if an ordinance was required, a ratification by ordinance was not sufficient; the court
“A majority of the court hold that the mayor and council are themselves only agents, and in providing for street improvements to be paid for by abutting lot owners, can only act in strict accordance with the powers delegated to them; and if they act in some other mode than that provided for by statute, *632 as by resolution, where they should act by ordinance, their acts are utterly null and void, and cannot be subsequently ratified or confirmed by ordinance or otherwise.”
If there is any doubt whether his was an ordinance or not; if there is a doubt as to whether an ordinance is required, under the authorities, that doubt should be resolved in favor of the taxpayers and against the exercise of the power, 1 Dillon on Muncipal Corporations, section 8, and the language there used has been practically ad-pted by our supreme court in Ravenna v. Penn. Co., 45 Ohio St., 121. Dillon says
“It is a general and undisputed proposition of law that a municipal corporation possesses and can exercise the following powers, and no others: First, those granted in express words; second those necessarily or fairly implied in or incident to the powers expressly granted; third, those , essential to the declared objects and purposes of the corporation — not simply convenient, but indispensable. Any fair, reasonable doubt .concerning the existence of power is resolved by the courts against the corporation, and the power is denied.”
I am of opinion that before this power of sale could be exercised in any respect it was necessary that the council should pass "an ordinance providing for the same, and I am unable to arrive at the conclusion that this paper which was denominated a resolution — the acceptance of the Berlin Brothers Company bid — was an ordinance providing for the exercise of such power of sale, and for that reason the proceedings for the sale and the attempted sale, in my judgment, were null and void, both as to the outáide and the inside property.
It is-also charged that the council was guilty in this transaction of an abuse of corporate power. Section 1777, Bevised Statutes, jiroyides: He (the city solicitor) shall apply in the name of the corporation to a court of competent jurisdiction for an order of injunction to restrain the misapplication of funds of the corporation or the abuse of its corporate powers * * * This question was not presented in the common pleas court, as no evidence was offered in that court except upon the alleged irregularities in the proceedings of the council. The proceedings looking towards the sale of this plant covered some time, evidently; for the evidence shows that in July, 1899, the council took steps to have this property advertised for sale, and in considering whether the council has been guilty of an abuse of corporate power, it is necessary to speak briefly of wbat was done with reference to the whole transaction.
As has been said by my colleague, whether it was good policy or not to dispose of this plant, is a matter which is undoubtedly committed by the law to the judgment and discretion of the council. All of the court agree, under the law as it stands, that the council, if it proceeds according to law, may sell the property without the concurrence of the gas trustees. A section of the statute provides that waterworks can not be sold without the concurrence of the waterworks trustees, and that school property cannot be sold without the concurrence of the board of education, and that infirmaries cannot be sold but with the concurrence of the board; but, for some reason, or from oversight the legislature did not provide that this property could not be sold without the concurrence and approval of the gas trustees. It would have been a very wise *633 provision had the statute provided, as it does in the case of waterworks, that the gasworks should not be sold without the concurrence of the trustees who had been elected by the people for the purpose of managing this property, some of whom had been members of the board for many years, and the entire plant being an institution established by a vote of the people— for, upon examination of the statute, we find that it required a vote of sixty per cent, of the voters voting thereon to authorize the issuance of the bonds. It might be prosumed that these trustees, among whom w;ere some of the most prominent citizens of the community and who had given these questions much consideration — they might be presumed to have more knowledge of what would be best to do with this plant than men who had recently been elected to the council and who had had no experience in such matters, and it would have been a very proper act of the council to have sought the advice of the gas trustees in regard to selling the property and plant,but the statute does not require that. In July of last year this property was first offered for sale. The highest bid then was $256,000. After the bids were opened, the mayor of the city, as he testified, in order to save the property from sale to private owners and being sacrificed at what he regarded as a disproportionate price, filed, within ten days, a cash bid for these two properties, of $300,000, and was ready and willing to take the property at his bid of $300,000, and further offered to agree that the city might have the property back whenever it desired to purchase it from him. at what it had cost him. The council might have accepted this bid, under the law, as the statute gives the right to accept any bid within twenty days as high as the highest bid filed. But the council rejected the bid of $300,000, ana rejected all bids, and in October again advertised the property for sale.
By section 2673a, as has been said, it is only required that advertisement be made for two weeks,in some local newspaper, and there was no statute providing that the council should advertise for bidders for this immense plant in different parts of the country, as a private owner would have done or as a receiver would have been ordered to do, to secure bids from men interested in such enterprises all over the United States. But it was advertised for two weeks again, in a local paper only, and bids were again made, two only, one of them being the-bid now under consideration in this case, and which contained a condition, among others, that the council should pass a rate ordinance fixing the price of gas to the satisfaction of the Kerlin Brothers Company, a condition wholly unlawful and void, and the council might have entirely disregarded the bid for that reason — for it certainly had no power or authority under the law to agree with the Kerlin Brothers Company that the council would pass an ordinance fixing the rate for the price-of gas satisfactorily to them. This bid was afterwards accepted, and the council thereafter did pass an ordinance giving them a perpetual franchise in the streets of the city of Toledo, and passed an ordinance fixing a rate for the price of gas satisfactory to the Kerlin Brothers Company; so that the city *634 oounoil did everything in their power to carry out the unlawful and illegal part of this bid. As has been said by my colleague, the life of the council expired before this ordinance required by the Kerlin Brothers Company could go info effect, and therefore it and the attempted sale of the inside plant beoame null and void; but it was a part of the power attempted to be exercised by the city council,and a part of their conduct in relation to this matter, and they sold, or attempted to sell to the Kerlin Brothers Company the inside property for $126,000, and the outside property for $102,000, a total of $228,000.
As the inside property is held by all the court not to have been legally sold, it is not necessary to discuss its value. Under the undisputed evidence in this case, the property had enhanced in value from forty to sixty per cent, during the period from July or August to December, 1899, when the property was sold to the Kerlins, say fifty per cent. Pipe had advanced to a very high price. It was scarce, and new pipe was in great demand, and, as witnesses say, second-hand pipe sold readily —for many who needed pipe could get nothing else. The mayor’s offer in July, to save the property from sacrifice, was $300,000; by December the property had advanced fifty per cent, in valuó and was then sold for $72,000 less than the mayor’s bid in July.
There was a large amount of testimony offered here as to the value of this plant and property outside of the city bearing upon the question of the abuse of corporate power. There were someiseven witnesses called, five on the part of the city and two for the defense. Although the question as to the ex act value of this property, as has been said, is somewhat diffi cult to answer, yet experienced men, who have bought new pipe, who have laid it in the ground and who have seen it after it came out, and who knew the nature of it, are able to tell pretty nearly what it is worth, and the only way that a court can arrive at its value is to take the evidence here and from it reach a conclusion. Upon this question, for the defense, R. G. Kerlin, the president of the defendant company, testified, and one witness from Indiana by the name of Driscoll, who is in Kerlin’s employ, or in the employ of a company in which Kerlin is interested. Taking all of the testimony together and averaging it, as is sometimes done, would make the value of this property outside of the city $325,000 — in round numbers. Mr. Grossweiler, who had had sixteen years’ experience in the business, and who is now connected with the Toledo Gas & Fuel Company, and who was six years purchasing agent for that company and was perfectly familiar with prices, gives his estimate of the value of the pipe at about $225,000; which was about fifty per cent, of the value of new pipe; and I may say that new pipe at that time had as stable and fixed a selling price and specific value as wheat, and when the value of the other property is added, it makes a total of about $235,000. The mayor of the city, Mr. Jones, who testified that he had had large experience in the gas business since 1865, and in both new and second-hand pipe; that he had employed many men and carried on a land business, made a careful estimate of the value of this plant outside the city, and testified that in his judgment it was worth $400,000, to dismantle, take up and sell *635 on the market. Mr. T. P. Brown, who wa* a gas trustee for some years, testified that in his judgment it was worth $575,000. Mr. Edwin D. Philipps,brought here from Columbus, who appeared wholly disinterested, who was for sixteen years in the natural gas business, estimates the entire value of the plant outside at $236,000, and in round numbers, the pipe-line alone, about $225,000. Mr. William P. Heston, who has been the manager of the natural gas plant ever since its inception and who probably had as good an actual knowledge of this pipe as any one who was called, estimated the value of the plant outside the city at $600,000. These estimates were all of its value to dig up, dismantle and sell. Mr. Driscoll, who came here from Indiana, and who was in the employ of the Kerlins, and Mr. Kerlin himself were the only witnesses called by the defense on the subject, and they testified that in their judgment, when everything was taken out that should be allowed, it would be worth $122,107. In arriving at these figures they were obliged to take out ten cents per foot for taking the pipe out of the ground, which would make $42,000, while other witnesses estimated this expense at three cents per foot; and they also deducted $10,000 for possible freight tjiat they might be compelled to pay to ship the pipe to different parts of the country. Neither Mr. Kerlin nor Mr. Driscoll, his employe, could be said to be disintersted. Mr. Philipps seemed to be entirely disinterested and a man who was entirely fair and without political interest in the question, and after a careful computation in the presence of the court, gives his estimate at $236,333. Mr. Grossweiler, who is wholly disinterested and a man of experience, as I have said, gives his estimate of the pipe alone at $225,656,and when there is added to this the other things that should be taken into consideration, his estimate runs up to about $235,000, adding to his value of the pipe the value Mr. Kerlin himself put upon the telephone line, build-, ings, boilers, pumps, etc. Now there are two witnesses who are wholly fair and disinterested and entirely removed from any feeling whatever in the matter, and they give it as their judgment that this property is worth from $235,000 to $240,000.
Now it should be presumed that the council knew the value of this property before they undertook to sell in this manner; that they informed themselves as to the probable value of the property which they undertook to sell to the Kerlin Brothers Company for $102,000 which from the evidence was worth at the very least $225,000. The sale of property for so grossly inadequate a consideration as this, in my judgment constitutes an abuse of corporate power, and that it should be so held by the court. Allowing to the Kerlin Brothers Company what should be considered as a large profit, say $25,000, there is here over and above any legitimate profit, $100,000 of property that belongs to the taxpayers of his municipality turned over practically as a gift to the Kerlin Brothers Company.
While it may be said,and it has been said, that this value is to some extent uncertain, yet it has been made as certain to this court as human testimony could make it, by the evidence of men who had had the widest experience and who appear to be frank, honest and truthful. The defendant was given every opportunity to call witnesses, and it called none except Kerlin himself and an employe, while the city called five win esses, *636 all without any pecuniary interest in the case except as taxpayers. The average value of this property, taking all of the witnesses together, is, as I have stated, over $300,000, and its very lowest value is certainly $225,000. Can it be said that the-sale of this immense property for less than half its value, and at a loss to the city of $100,000, is not an abuse of corporate power? If it is not, then that provision had better be stricken out of the statute. It is put there for some purpose. It should' be construed, not strictly against the taxpayer, but liberally in his behalf and strictly against his agents who are handling and selling and disposing of his property. The fact that the-plant is being run at a loss on account of the decrease of the supply of natural gas, is no reason of excuse for selling the-pipe and other property for half their value.
There have been some decisions upon this question, and I will call attention to one of them. I refer to a New York case-found in 5 New York Supplement, a decision of the supreme-court of New York. The court say, in a case where property was about to be bought at a price one-fourth more than it wasworth:
“For- a mere error in judgment, involving no' greater difference than might exist between persons purchasing property for themselveB, the court would not be required to interfere and restrain the purchase under the statute, but for so large a. difference as appears here the case requires to be otherwise considered. It involves an appropriation of a large sum of money belonging to the public, for which no equivalent is to be received by the city, and it is accordingly, in all substantial respects the gift or donation of so much money to the person from whom the property is proposed to be purchased. This the law will not permit. It requires the same fidelity, care and caution on the part of the individual representing the-public interests as would be expected to be used by an individual purchasing the like property for himself and paying for it with bis own money. In all public positions the law not only expects, but it exacts, this degree of care and fidelity from those representing public interests, and it is because these expectations have not always been realized, and the obligation has not been observed, that the statutes have been passed, allowing the taxpayers to institute suits in their own names to-prevent the misappropriation of public moneys or public property. It has been found necessary, in addition to the obliga tions imposed upon public officials, to subject them to this restraint and oversight on the part of the taxpayers, not only to-keep down their own expenditures and burden, but to exact-from the officials a complete and careful discharge of the duties imposed upon them by the laws.”
The court held that it was an abuse of corporate power calling for the interference of the court when property was to be purchased for one-fourth more than its value; and what shall be said when property is sold for less than one-half its value, at a loss to the city of more than $100,000?
I am unable to avoid the conclusion that under section 1777, taking all these things into consideration, here was an abuse of corporate power which calls for the action and intervention of the court. In my judgment the city solicitor was fully warranted and justified and simply did his duty in applying to- *637 the court in the name of the taxpayer* and people, to protect them from their agents who were thus disposing of their property
E. W. Tolerton and Hamilton & Kirby, for Plaintiffs,
if. B. Brailey, City Solicitor, O. S. Northrup and Orville S. Brumbaek, for Defendant.